## PEOPLE v. KENNEDY.

(Supreme Court, General Term, First Department. February 17, 1893.)

1. MANSLAUGHTER IN THE FIRST DEGREE.
  Under Pen. Code, § 189, defining manslaughter in the first degree as homicide committed without design to effect death, in the heat of passion, by means of a dangerous weapon, a conviction may properly be had on testimony that deceased and defendant had a struggle on the sidewalk; that deceased had hold of defendant, and struck him, without having any weapon; and that defendant returned the blows by shooting deceased.

2. CRIMINAL LAW—EVIDENCE—HARMLESS ERROR.
  Error in allowing the state to ask defendant if he had not had fights with several persons, with some of whom he admitted that he had had altercations, is rendered harmless by afterwards having it stricken out, because not followed by testimony showing conviction therefor, and instructing the jury to disregard it.

3. HOMICIDE—THREATS.
  Evidence that deceased had stated that "he could do any one that he wanted to, and that nothing could be done to him, because he was supposed to be crazy," is properly excluded as being a general remark, having no reference to defendant.

Appeal from court of oyer and terminer, New York county.

Daniel Kennedy was convicted of manslaughter in the first degree, and appeals. Affirmed.

Argued before VAN BRUNT, P. J., and O'BRIEN and FOLLETT, JJ.

Purdy & McManus, (Ambrose H. Purdy, of counsel,) for appellant.

De Lancey Nicoll, Dist. Atty., (Henry B. B. Stapler, Asst. Dist. Atty., of counsel,) for the People.

O'BRIEN, J. The defendant was tried upon an indictment charging him with the crime of murder in the first degree, committed on the 20th of December, 1891, in the killing of one John Keating, which trial resulted in a verdict of the jury finding the defendant guilty of manslaughter in the first degree; and from the judgment entered thereon this appeal is taken. Upon the trial it was shown that the deceased, who was a married man, on the night in question, which was a Sunday evening, left his home after supper, and, together with his father-in-law, went to a saloon on the corner of Seventeenth street and Avenue A, which was reached about eight o'clock. After a quarter of an hour spent in the saloon, the defendant, accompanied by one Kingston, came in, and the defendant invited the deceased to drink, which invitation was accepted by the deceased. According to the account given by the father-in-law, the drink being taken, the defendant requested the deceased to come out on the sidewalk, saying he wished to see him, and that thereupon the witness, the deceased, the defendant, and Kingston went out of the saloon on the sidewalk, and that within three or four seconds thereafter the defendant drew a revolver, and discharged its contents into the body of the deceased, saying, "Take that;" that thereupon the deceased walked back into the saloon, followed by the defendant. In addition to this witness, a police officer was examined, who testified that he was on the north side of Seventeenth street, di-

rectly opposite the saloon, and noticed four persons,—two on the south side of Seventeenth street, in front of the entrance to the house in which the saloon was, and two more standing eight or ten feet west of the door; that he turned his eyes away for half a minute, when he heard a pistol shot, and, turning in the direction of the report, saw three men going in the door,—the two who had been standing there, and one of the other two. The deceased was taken to Bellevue Hospital, where it was found that he had been shot in the abdomen, and from the wound thus received he died on the following afternoon. On his person was found a penknife, which was shown to be the only weapon that the deceased had on that night. The defense was justifiable homicide, the defendant claiming that the deceased had for years threatened his life,—on two former occasions having stabbed him,—and that the ill will between them had a few months prior to the fatal occurrence been accentuated by the belief on the part of the deceased that the defendant was instrumental in procuring the conviction of a brother of the deceased, who was then serving a sentence in state's prison.

The ground most strongly urged for a reversal of the judgment is that the evidence was susceptible of only one of two conclusions: That, taking the case as made by the people, it was a deliberate, premeditated, cold-blooded murder, for which the defendant should have been convicted of murder in the first degree, or, taking the evidence of the defendant and his witnesses, it presented a perfect defense of justifiable homicide; but that, in any view to be taken of the evidence, it would not justify a conviction of manslaughter in the first degree, which was the verdict rendered in the case. There can be no doubt, upon the evidence, that the deceased was a violent, quarrelsome man, disposed to quarrel upon the slightest pretext; but in this respect he does not seem to have been in character much worse than the defendant, who, on his own testimony, was arrested two or three times for assault, and who, with a pistol in his pocket, was not disposed to avoid a quarrel. While it is true that the deceased had made frequent threats against the defendant, covering a period of years, it is still made to appear that frequently during such period the parties had met, and apparently amicable relations were restored, and that violence or threats of violence directed towards the defendant were usually indulged in by the deceased while under the influence of liquor. Taking the testimony of the father-in-law of the deceased, or giving credit to that of the defendant's witness Kingston, it is clear that the going out from the saloon to the street was upon the invitation of the defendant, and, as no other reason is assigned for requesting the deceased to leave the saloon, it is susceptible of the conclusion, in view of what occurred, that it was with the predetermination to take the life of the deceased. This man, Kingston, testified that in leaving the saloon the defendant went first, and that he was between the defendant and the deceased; that in going out the deceased used abusive language, and attempted to stab the defendant with what the witness designated as a large dirk, but which, as was clearly shown, if this witness is to be believed at all, could only have been an ordinary penknife. Assuming, however, that the effort

to use this penknife was made by the deceased in going through the hallway, Kingston testified that he had hold of the deceased, and that, while so having hold of him, the door leading into the street was closed, the defendant having reached the street, leaving the deceased and Kingston inside. No effort was made by the defendant to avoid an encounter, but on the contrary he waited until the door was opened, and the deceased came out, and within a few seconds, not more than sufficient, if some of the witnesses are to be believed, to enable the defendant to draw the revolver from his pocket, and fire the fatal shot. We are inclined to agree with appellant's counsel that much of the evidence was susceptible of the view, and would have justified a verdict, of deliberate murder. There were, however, besides those already referred to, other witnesses, and notably one produced by the defendant, whose version it was in the province of the jury to accept. Section 189 of the Penal Code defines manslaughter in the first degree as homicide committed without design to effect death either—"First, * * *; second, in the heat of passion, but in a cruel or in an unusual manner, or by means of a dangerous weapon." This witness, White, claimed to have been a witness to a struggle on the sidewalk between the defendant, the deceased, and Kingston, and that he saw the deceased striking the defendant, but did not see any knife in the hands of the deceased; that the deceased had hold of the defendant, and was striking him This testimony, if believed by the jury, would make out a clear case of manslaughter in the first degree, because showing that the deceased struck defendant without using a weapon, and that the defendant returned these blows by killing the deceased with a deadly weapon. To hold that such evidence established the defense of justifiable homicide would be to upset all well-settled rules and statutes, which point out the duty of one engaged in a quarrel, and the necessity of his avoiding the attack, if in his power, and of not becoming the aggressor, unless other means were unavailable, and, at most, to use only such force as was necessary to prevent injury to himself. Whether there was reasonable ground for the defendant to apprehend a design on the part of the deceased to take his life was a question which, upon the testimony in this case, was peculiarly one for the jury; and they having found against the defendant, upon competent and sufficient evidence, it is not within the province of this court to disturb their verdict. Taking the entire record, we think that the jury indulged in every inference as favorable to the defendant as the evidence warranted, and that with their conclusions he has no cause of complaint.

The verdict being supported by ample evidence, and the defendant being justly convicted of an aggravated crime,—one for which we can find neither palliation nor excuse,—we are compelled to approach the consideration of the few exceptions appearing in the record by recalling the provisions of the Criminal Code, which require this court, after hearing the appeal, to give judgment "without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties." Crim. Code, § 542.

The first error assigned in the admission of evidence has reference to the cross-examination of the defendant, who, under objection and exception, was interrogated as to fights into which he had entered with several persons whose names were stated to him. With some of these persons the defendant admitted he had had altercations, and with others that he had not. As shown by the record, the learned trial judge was under the impression that this evidence was to be followed up by other testimony showing trial and conviction for the offenses. This not being forthcoming, the defendant was recalled, and the court thereupon stated that, upon consideration, it would strike out all the testimony as to the defendant's having been arrested for assaults, and would tell the jury to disregard it. In this disposition the counsel for the prisoner seems to have acquiesced, as shown by what occurred upon the trial. After the statement that the testimony would be stricken out, the court said:

"I supposed he [the district attorney] intended to follow it up by statements showing the indictment and subsequent proceedings. But, rather than have it stand, I think it fair to the defendant to strike it out. Mr. Purdy: These are twelve intelligent gentlemen."

In addition to this occurrence, the court was careful in its charge to remind the jury that this evidence had been stricken out, and instructed them to disregard it. We fail to see, in view of what took place, how the defendant could have been injured.

The only other exception urged is one relating to the exclusion of a question asked of a witness, as to whether the deceased had not stated "that he could do any one that he wanted to, and that nothing could be done to him, because he was supposed to be crazy." The court, we think, properly excluded this, upon the ground that it was not said with reference to the defendant, nor had it any relation to him, but was a general remark at some time made by the deceased, and could have no bearing and effect as showing motive or ill will on the part of the deceased towards the defendant, which would evidence design upon the defendant's life.

We might, at greater length, have referred to the testimony, notably that presented by the defendant to establish the defense of justifiable homicide, but no useful purpose would be served thereby; it being sufficient to advert to so much of the evidence as disposes of the contention that it was only susceptible of a verdict of murder in the first degree, or of justifiable homicide. As shown, there was sufficient, upon the testimony adduced by the defendant's witnesses, to justify the verdict of manslaughter in the first degree. Upon examining the record, we can find no good reason for disturbing such verdict, which is amply supported by competent evidence, rendered upon a trial in which every right to which the defendant was entitled was secured by a fair and impartial charge of the trial judge, and by the application of correct principles to rulings upon the admission and rejection of evidence, and to the facts as proved. We are of opinion, therefore, that the judgment of conviction should be affirmed. All concur.